## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

MATTHEW ELLISON, *et al.*,

           Plaintiffs,

vs.                                             Civ. No. 02-127  MV/LFG

GAB ROBINS, INC.,

           Defendant.


JOHN W. LANE
   and JOHN (JACK) MCKEON,

           Plaintiffs,

vs.                                             Civ. No. 03-348 MCA/RLP

GAB ROBINS, INC.,

           Defendant.


## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Plaintiff's Motion for Summary Judgment,

filed September 17, 2004, **[Doc. No. 90]**, and Defendant's Cross-Motion for Summary Judgment,

filed May 30, 2003, **[Doc. No. 56]**.[1]  The Court, having considered the motions, briefs, relevant

---

[1]  Defendant's Cross-Motion for Summary Judgment was filed prior to Plaintiffs' Motion for Summary Judgment because Plaintiffs' original motion for summary judgment, filed on April 9, 2003, was struck by the Court for failure to comply with a number of federal and local rules.  The Court granted Plaintiffs leave to refile a motion and supporting materials that complied with federal and local rules.

law and being otherwise fully informed, finds that Plaintiffs' Motion for Summary Judgment is well-taken and will be **GRANTED in part** and Defendant's Cross-Motion for Summary Judgment is well-taken and will be **GRANTED in part**.

## BACKGROUND

On May 4, 2000, the National Park Service initiated a prescribed burn on federal land at Bandelier National Monument in New Mexico.  A day later, this prescribed burn exceeded the containment capabilities of the National Park Service and spread out of control.  The fire, which became known as the Cerro Grande Fire, resulted in the loss of federal, state, local, tribal and private property.

The Secretary of the Interior and the National Park Service assumed responsibility for the Cerro Grande Fire and for the consequential loss of property.  Following the fire, the United States Congress passed the Cerro Grande Fire Assistance Act ("CGFAA"), appropriating $455,000,000.00 to compensate the victims of the Cerro Grande Fire for their injuries and losses.

Congress delegated the duties of processing and paying claims under CGFAA to the Director of the Federal Emergency Management Agency ("FEMA").  Congress, however, authorized FEMA to appoint an independent claims manager to assume any and all of FEMA's duties under the CGFAA.  FEMA subsequently contracted with Defendant GAB Robins North America, Inc., ("GAB"), a company with extensive experience in providing catastrophe adjusting services, to assist FEMA in developing and administering a program to expeditiously evaluate and pay Cerro Grande Fire claims.

GAB recruited and hired more than 100 experienced catastrophe adjusters, many of whom were on its regular roster of catastrophe adjusters, to work as "Claims Reviewers" on the Cerro

Grande Fire project.  Claims Reviewers were responsible for investigating and evaluating the

claims of those who suffered losses as a result of the Cerro Grande Fire and for making

recommendations to their supervisors regarding the compensation that should be received by each

claimant.  Once a Claims Reviewer received a notice of loss, the Claims Reviewer would meet

with the claimant to explain the claims-handling process, outline the information and

documentation needed to process the claim, and help the claimant formulate a strategy for

obtaining any necessary documentation or other support.

Once a claim was submitted, Claims Reviewers verified the claim by:

* confirming damage and/or losses
* reviewing supporting documentation
* confirming that the Cerro Grande Fire was the cause and origin of the losses
* verifying receipts
* assessing damage
* determining the accuracy of the claimed amount
* preparing estimates of damaged property
* researching prices of damaged property
* confirming that the Cerro Grande Fire Assistance Act provided coverage for the type of loss claimed
* verifying public records
* reviewing insurance settlements to avoid duplication of benefits
* conducting site visits
* estimating losses such as lost earnings, reductions in earnings, lost business revenue, lost rental income and property damage

The Claims Reviewer then prepared a payment recommendation package, which detailed

the extent and nature of the claimant's losses and recommended an amount to fairly and

reasonably compensate the claimant.  Prior to making a final recommendation to FEMA, the

Claims Reviewer negotiated with the claimant in an attempt to reach an agreement as to the value

of the claim.  If the Claims Reviewer could not reach an agreement with the claimant, the Claims

Reviewer included both the Claims Reviewer's recommendation and the claimant's opinion in the

final payment recommendation package.

The final payment recommendation package was reviewed by GAB supervisors and then by FEMA, with FEMA making the ultimate decision about how much to pay claimants. Claims Reviewers' recommendations as to the extent and nature of a claimant's loss and the amount necessary to fairly and reasonably compensate a claimant for this loss were generally accepted by both GAB supervisors and FEMA.

Two different compensation structures, referred to as Task Order I and Task Order II, were in place during the relevant time period. From the project's inception until April 1, 2001, ("Task Order I"), FEMA paid GAB $57.50 per hour for each hour a Claims Reviewer worked. GAB purportedly paid the Claims Reviewers the greater of a 60% commission on the hourly rate received by GAB (approximately $34.50 per hour) or a guaranteed salary of $541.67 per semi-monthly pay period plus per diem at a rate of $124 per day ($868 per week).

Under Task Order II, which took effect April 1, 2001, FEMA paid GAB on a fee-per-claim basis. Accordingly, GAB purportedly began paying Claims Reviewers on a straight salary basis plus per diem with no commission. At the outset of Task Order II, Claims Reviewers were asked to choose among three salary options based on a 60, 66, and 72 hour workweek. The bi-weekly salaries based on the three salary options ranged from $2,869.20 to $3,227.24, plus per diem.

Plaintiffs, a group of approximately forty individuals who worked as Claims Reviewers on the Cerro Grande Fire project, filed this action asserting that GAB improperly claimed that the Claims Reviewers were exempt from the overtime requirements of the Fair Labor Standards Act.

4

## **LEGAL STANDARD**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Jones v. Kodak Medical Assistance Plan*, 169 F.3d 1287, 1290 (10th Cir. 1999).  Under Rule 56(c), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson*, 477 U.S. at 248.

Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  *See Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993).  There is no requirement that the moving party negate the nonmovant's claim.  *See Celotex Corp. v. Catrett*,  477 U.S. 317, 325 (1986).  Once the moving party meets its burden, the nonmoving party must show that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof."  *Applied Genetics Int'l Inc. v. First Affiliated Secs., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1991) (citations omitted).  Rather than "merely show there is some metaphysical doubt as to the material facts," the nonmoving party is required to "go beyond the pleadings and, by affidavits or depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial."  *Kaus v. Standard Ins. Co.*, 985 F. Supp 1277, 1281 (D. Kan. 1997), *aff'd*, 162 F.3d 1173 (10th Cir. 1998).  There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict

5

for that party.  *See Anderson*, 477 U.S. at 248.   Upon a motion for summary judgment, the Court "must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence."  *Kaus*, 985 F. Supp at 1281.

## DISCUSSION

The Fair Labor Standards Act ("FLSA") establishes minimum labor standards to eliminate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a).   The statute was designed to "aid the unprotected, unorganized, and lowest paid of the nation's working population; that is, those employees who lacked sufficient bargaining power to secure for themselves a minimum subsistence wage."  *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 n. 18, 65 S.Ct. 895, 902 n. 18 (1945).  Under the FLSA, an employer must pay an employee overtime compensation when an employee works more than forty hours in a week. 29 U.S.C. § 207(a)(1).  But, an exemption from the overtime pay requirement exists for employees in a "bona fide executive, administrative, or professional capacity" as defined by regulations of the Secretary.  29 U.S.C. § 213(a)(1).

GAB asserts that the Claims Reviewers were administrative employees, exempt from the FLSA.  The FLSA exemptions are to be "narrowly construed against . . . employers" and are to be withheld except as to persons "plainly and unmistakably within their terms and spirit."  *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392, 80 S.Ct. 453, 456 (1960); *Reich v. State of Wyoming*, 993 F.2d 739, 741 (10th Cir. 1993) (employer must show that the employee fits "plainly and unmistakenly within the exemption's terms").  It is the employer's burden to prove that the employee is exempt by "clear and affirmative" evidence.  *Donovan v. United Video, Inc.*, 725

F.2d 577, 581 (10th Cir. 1984).

The Department of Labor ("DOL") has promulgated regulations interpreting the FLSA. The DOL regulations "are entitled to judicial deference, and are the primary source of guidance for determining the scope and extent of exemptions to the FLSA." *Spradling v. City of Tulsa*, 95 F.3d 1492, 1495 (10th Cir. 1996) (citation omitted). The DOL regulations provide that an employee is employed in an executive, administrative or professional capacity if the employer demonstrates that the employee (1) is paid on a salary basis, (2) at a rate of not less than $250 per week, and (3) the employee meets the "duties test." 29 C.F.R. §§ 541.1, 541.2 and 541.2.

A.      Salary Basis

An employee is considered paid on a salary basis if "he regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. §§ 541.118 & 541.212. The fact that an employee is paid a guaranteed minimum salary plus a commission does not defeat the salary basis. "[A]s long as there is a non-deductible minimum, additional compensation on top of the non-deductible salary is permissible." *Hogan et al. v. Allstate Ins. Co.*, 361 F.3d 621, 625-26 (11th Cir. 2004) (citing 29 C.F.R. § 541.118 ("The requirement will be met, for example, by a branch manager who receives a salary of $155 or more a week and in addition, a commission of 1 percent of the branch sales.")); *Aaron v. City of Wichita, Kansas*, 54 F.3d 652 (10th Cir. 1995) (overtime compensation is not inconsistent with salaried status).

1.  Task Order I

Whether the Claims Reviewers were paid on a salary basis during Task Order I depends

on whether GAB structured a compensation scheme consisting of the greater of a salary plus per diem or an hourly commission or if GAB improperly attempted to circumvent the FLSA's overtime requirements by purporting to establish a guaranteed salary but, in reality, paying strictly on an hourly basis.

Hart Hubbard, Vice President of Special Operations for GAB and project manager on the Cerro Grande Fire project, hired many of the Claims Reviewers.  Hubbard testified that when he hired the Claims Reviewers, he told them that "the hourly rate was $57.50 per hour and they would be getting sixty percent of the $57.50 per hour."  This  statement is consistent with the Claims Reviewers' testimony that they were told that they would be paid $34.50 per hour to work on the project.

When the Claims Reviewers arrived in New Mexico to begin work on the Cerro Grande Fire project, they each signed a document which stated, in part, that:

> As a Commission Employee, you will be paid Semi-Monthly.  You will receive a salary of $541.67 per pay period and per diem based on IRS guidelines on the 15th and the last day of the month.  The salary and per diem will be offset against your 60% commission.

Thus, according to this document, the Claims Reviewers were to be paid the greater of a semi-monthly salary of $541.67 plus per diem or a commission of $34.50 per hour worked (60% of $57.50).

Hubbard testified that GAB's official policy was to pay Claims Reviewers the $541.67 per pay period even if they missed work because of sickness.  GAB presented no evidence, however, that any procedures were put in place to ensure that the salary was paid.  To the contrary, Hubbard testified that the Cerro Grande Fire project managers could not check to see if the salary

was being paid by the home office in New Jersey because the paychecks came in sealed envelopes.

Due to the large disparity between the guaranteed salary and the hourly commission, the hourly commission was rarely less than the guaranteed salary.  The parties agree, however, that a Claims Reviewer's hourly commission was less than the guaranteed salary on at least three occasions.  In each of these instances, the guaranteed salary was not paid; rather, each Claims Reviewer was paid $34.50 for each hour worked.

When determining whether an employee is paid on a salary basis, an employer's actual practice and conduct is afforded more weight than its policies or stated intentions.  "The question is not whether an employer has the subjective intention that its employees be exempt from the FLSA's overtime provisions.  Rather, it is whether the employer has evinced the objective intention to pay its employees on a salaried basis as defined in the Secretary's regulations."  *Klem v. County of Santa Clara, California*, 208 F.3d 1085, 1093 (9th Cir. 2000) (summarizing the Secretary of Labor's position on determining an employer's intent to pay on a salaried basis for purposes of 29 C.F.R. § 541.118(a)(6)).

The employment agreement signed by the Claims Reviewers and Hubbard's testimony that the official policy was to pay Claims Reviewers the $541.67 per pay period even if they missed work because of sickness are evidence that GAB had a subjective intent that Claims Reviewers be salaried employees exempt from the FLSA.  However, the fact that Claims Reviewers always were paid by the hour, even when the hourly commission was less than the purported salary,

provides objective evidence that GAB did not intend to pay Claims Reviewers on a salaried basis.[2]
GAB's lack of intent to pay the Claims Reviewers on a salaried basis is further evidenced by the
fact that GAB did not have any procedures in place to ensure that the salary was paid.  The Court
finds it particularly significant that the salary was *never* paid.  In every instance in which a Claims
Reviewer's hourly commission was less than the salary, the Claims Reviewer was paid the hourly
commission.

Construing the exemption narrowly against GAB, as required by law, the Court finds that
the undisputed facts demonstrate that the Claims Reviewers were not paid on a salary basis and,
therefore, the Claims Reviewers cannot be exempt administrative employees under the FLSA.

Even if the Court found that the Claims Reviewers were paid a salary, GAB would still fail
to satisfy the salary basis test.   In each of the three instances in which a Claims Reviewer's

---

[2]  The additional evidence provided by Plaintiffs is of little probative value on the question
of whether Plaintiffs were paid on a salaried basis.  For example, Plaintiffs contend that the fact
that GAB maintained detailed accounts of the hours each Claims Reviewer worked is evidence
that the Claims Reviewers were paid solely on an hourly basis.  GAB, however, was billing FEMA
for each hour a Claims Reviewer worked as well as paying Claims Reviewers an hourly
commission.  Consequently, detailed time records were essential for GAB to accurately bill
FEMA and to properly calculate earned commissions.  *Cf. Douglas v. Argo-Tech Corp.*, 113 F.3d
67, 71 (6th Cir. 1997) (employer, as a government contractor, was required to keep records of
employees' hours and, therefore, use of a time clock does not preclude application of the
administrative employee exemption).  Under these circumstances, requiring employees to maintain
an accurate account of hours worked is not inconsistent with salaried status.  Plaintiffs' evidence
that a GAB supervisor threatened to dock Claims Reviewers for tardiness is similarly
inconclusive.  It is unclear if the supervisor was threatening to dock the purported salary or the
hourly commission.  Courts have held that compensation in addition to a guaranteed minimum
salary may be reduced without running afoul of the FLSA as long as no deductions are made to
the minimum salary.  *See Baudin v. Courtesy Lith Arts, Inc.*, 24 F.Supp.2d 887, 891 (N.D. Ill.
1998) ("Numerous courts have found that employers may make deductions from something other
than employee's base pay without destroying those employees' exempt status").  Plaintiffs have
not identified any instances in which a Claims Reviewer's guaranteed salary was docked for
tardiness or other infractions.

commission was less than the guaranteed minimum salary, the Claims Reviewer had missed work

due to sickness.[3]  GAB concedes that it is improper under the FLSA to deduct days missed due to

sickness from an employee's salary.[4]  GAB claims, however, that the three instances in which

these deductions were made were mistakes that it properly corrected within the window of

correction provided by the FLSA.[5]

In some circumstances, an employer may remedy improper deductions from an exempt

employee's salary--and avoid losing the employee's exemption from the FLSA--through the

window of correction established by 29 C.F.R. § 541.118(a)(6), which provides:

> The effect of making a deduction which is not permitted under these
> interpretations will depend upon the facts in the particular cases . . . [W]here a
> deduction not permitted by these interpretations is inadvertent, or is made for
> reasons other than lack of work, the exemption will not be considered to have been
> lost if the employer reimburses the employee for such deductions and promises to
> comply in the future.

29 C.F.R. § 541.118(a)(6).

---

[3]  In addition to these three incidents, Plaintiffs assert that deductions were made to
Florence Hall's minimum salary when she was ill.  Plaintiffs cite to two time reports for Florence
Hall that purportedly show that she missed work on March 23, March 24, March 27 and
March 30, 2001 due to illness.  In those two weeks, however, Florence Hall worked more than
32.5 hours per week even with the absences so her commission pay exceeded the guaranteed
salary.  Thus, it is impossible to determine from this evidence if GAB improperly made deductions
from Ms. Hall's guaranteed minimum salary for absences occasioned by sickness.

[4]  The DOL regulations provide that deductions may be made to a salary when an
employee absents himself from work for a day or more for personal reasons, other than sickness.
29 C.F.R. § 541.119(a)(2).  Deductions may only be made for absences of a day or more
occasioned by sickness or disability "if the deduction is made in accordance with a bona fide plan
policy or practice of providing compensation for loss of salary occasioned by both sickness and
disability." 29 C.F.R. § 541.118(a)(3).  There is no evidence that GAB had a bona fide policy to
pay Claims Reviewers their salary if they missed work due to sickness or disability.

[5]  It appears GAB discovered and corrected these "mistakes" during a DOL investigation
for wage violations involving the Cerro Grande Claims Reviewers that occurred in late 2001.

The Secretary of Labor has taken the position that the window of correction is unavailable to employers with an actual practice of impermissible deductions.  *See Klem*, 208 F.3d at 1091-92 (summarizing Secretary of Labor's position on the availability of the window of correction). Under the Secretary's interpretation, the window of correction is available to cure inadvertent or isolated violations of the "salary basis" regulations when an employer has demonstrated an "objective intention" to pay on a salaried basis.  *Id*.  The window of correction, however, cannot be used by an employer to correct a practice of improper deductions to a salary because a practice of making such deductions indicates that an employer did not intend to pay on a salary basis.  *Id*. If an employer did not intend to pay on a salary basis, his employees were not exempt from the FLSA in the first place, and there is no exemption to preserve through the window of correction. *Id*.

If a regulation is ambiguous, the Court must defer to any reasonable construction by the Secretary, even though this interpretation might "not be the best or most natural one by grammatical or other standards."  *Pauley v. BethEnergy Mines, Inc*., 501 U.S. 680, 702, 111 S.Ct. 2524 (1991); *see Christensen v. Harris County*, 529 U.S. 576, 588, 120 S.Ct. 1655 (2000) ("deference [to an agency's interpretation of its own regulation] is warranted only when the language of the regulation is ambiguous").  Like the Seventh Circuit in *Whetzel v. Network Prop. Servs., LLC*, 246 F.3d 897 (7th Cir. 2001) and the Sixth Circuit in *Takacs v. Hahn Automotive Corp*., 246 F.3d 776 (6th Cir. 2001),  the Court finds that the window of correction regulation is ambiguous regarding whether it can be used to correct a policy or practice of making improper pay deductions.  While the regulation may be interpreted as allowing use of the window of correction in all cases except for those where there is a policy or practice of making pay

deductions for claimed salaried employees due to lack of work, it may also be read as allowing

use of the defense only when an employer does not have a policy or practice of making improper

pay deductions. *See, e.g., Whetsel*, 246 F.3d at 900( "the regulation does not explicitly state that

it is available to correct a policy or pattern of deductions, thus leaving open the question of

whether it applies to those circumstances").  Consequently, the Secretary's interpretation of the

regulation is entitled to deference as long as it is reasonable.

The Secretary's interpretation of the window of correction regulation as not being

available to an employer who has a policy of making improper pay deductions from claimed

salaried employees, is both reasonable and consistent with the FLSA regulations.  The Court

agrees that, when read in its entirety, the window of correction regulation allows use of the

defense only after an employer has first demonstrated an intention to pay its employees on a salary

basis.  *See id*. at 901 ("Use of the word 'lost' suggests that an employer must first establish that it

was entitled to the exemption, which requires inter alia that the employer demonstrate it was

paying its employees on a salary basis.").  As noted by the Ninth Circuit, "[t]o interpret the rule

otherwise would allow an employer to treat its employees as exempt for overtime purposes while,

at the same time, intentionally failing to comply with the 'salary basis' rule."  *Klem*, 208 F.3d at

1092.  If employers could simply "use the window of correction to comply retroactively with the

salaried-basis requirement," the "salary basis" test would be rendered "essentially meaningless."

*Klem*, 208 F.3d at 1092.  Because the Court finds the window of correction regulation to be

ambiguous and because the Secretary's interpretation of the regulation is not clearly erroneous or

inconsistent with the FLSA regulations, the Court will defer to the Secretary's interpretation.

The majority of circuits courts that have addressed the issue have adopted the Secretary's

13

interpretation that the window of correction is unavailable when there is an actual practice of making improper deductions.  *See Whetsel v. Network Property Services, LLC,* 246 F.3d 897, 901-04 (7th Cir. 2001) (applying deference to the Secretary of Labor's interpretation of the window of correction and holding that the window of correction is not available to an employer with a policy or practice of improper deductions); *Takacs v. Hahn Auto. Cor.*, 246 F.3d 776, 782-83 (6th Cir. 2001) (same); *Yourman v. Giuliani,* 229 F.3d 124 (2d Cir. 2000) (same); *Klem*, 208 F.3d at 1094-96 (same);  *but see Moore v. Hannon Food Service, Inc.*, 317 F.3d 489 (5th Cir. 2003) (declining to extend deference to Secretary's interpretation because regulation is not ambiguous).  Notably, while not specifically addressing the Secretary's interpretation, the Tenth Circuit has held that the "window of correction"  is not available "if the employer has a settled policy of making improper deductions from compensation."  *Spradling*, 95 F.3d at 1504.

Courts that have considered whether an employer had an actual practice of making impermissible deductions have recognized that this determination is to be made on a case-by-case basis.  *See, e.g., Yourman*, 229 F.3d at 130 (noting that there is no bright line test for what constitutes an actual practice of impermissible deductions).  The number of improper deductions is a factor to consider.  Numerous impermissible deductions over a significant period of time may be indicative of a practice of such deductions. *See Block v. City of Los Angeles*, 253 F.3d 410, 419 (9th Cir. 2001) (upholding a finding of an actual practice of deductions where plaintiffs proved 13 improper suspensions over a six year period); *Klem*, 208 F.3d at 1095 (affirming district court's ruling that 53 impermissible pay deductions among 5,300 exempt employees over a six-year period constituted an "actual practice"); *Cf. Paresi v. City of Portland*, 182 F.3d 665, 668 (9th Cir. 1999) (two impermissible deductions do not constitute an actual practice).

14

In this case the parties agree that in the 31-month period covered by Task Order I, GAB made improper deductions to Claims Reviewers' salaries on at least three occasions.  While the absolute number of improper deductions is not large, the fact that the deductions were made each and every time a Claims Reviewer's hourly commission dropped below the salary because the Claims Reviewer was absent due to sickness suggests that GAB had an actual practice of improper deductions.  Accordingly, GAB cannot use the window of correction to remedy its practice of  improper deductions.

Based on the undisputed facts, the Court finds, as a matter of law, that during Task Order I the Claims Reviewers did not satisfy the "salary basis" test and therefore were not exempt from the FLSA's overtime requirements.

### 2.  Task Order II.

Under Task Order II, GAB asserts that Claims Reviewers were paid a straight salary based on a workweek of 60, 66, or 72 hours.  Plaintiffs contend that the compensation scheme was actually unchanged from that during Task Order I and that the Claims Reviewers continued to be paid strictly on an hourly basis.  GAB has come forward with evidence demonstrating that during Task Order II, hourly time records were no longer maintained and Claims Reviewers were paid the same salary each week they performed some work unless they voluntarily chose to take days off.  Plaintiffs have failed to refute GAB's evidence that Claims Reviewers were paid on a salary basis during Task Order II.

Plaintiffs assert that the fact that Claims Reviewers who continued to work the same number of hours under Task Order II as under Task Order I received the same compensation is evidence that the compensation scheme was not changed.  At most, however, this fact

demonstrates that the salaries paid under Task Order II equated to the compensation scheme in place under Task Order I.  It does not suggest that the compensation paid in Task Order II was not a salary.

Next, Plaintiffs assert that there continued to be variation in the compensation received by Claims Reviewers during Task Order II and that this variation indicates that Claims Reviewers were actually being paid on an hourly basis.  Plaintiffs, however, have failed to come forward with evidence that the variations in pay were attributable to impermissible deductions based on the quality or quantity of work performed and not permissible deductions for personal leave of a day or more.

At least two plaintiffs--Hall and Pulkrabek-- have testified that they did not sign the Task Order II agreement and continued to work under the Task Order I agreement.  GAB admits that these two plaintiffs did not sign the Task Order II agreement but asserts that despite their failure to sign the new agreement, they were paid in accordance with the new compensation structure. GAB's position is supported by the payroll records that show Pulkrabek received compensation at the same rate--$2689.20 every two weeks--from April 15, 2001 to July 8, 2001 and that after April 1, 2001, GAB no longer recorded the amount of hours Pulkrabek worked.  Similarly, GAB's payroll records reveal that after April 1, 2001, Hall began receiving $2,689.20 every two weeks and GAB no longer recorded the amount of hours Hall worked.

Finally, Plaintiffs contend that during Task Order II, the Claims Reviewers' pay remained subject to docking.  The only evidence Plaintiffs provide in support of this assertion is an April 2, 2001 e-mail from a GAB supervisor to a Claims Reviewer in which the supervisor stated that "I could dock a person for being one minute late."  This e-mail does not support Plaintiffs'

position.  The e-mail is discussing an incident that occurred prior to the beginning of the

compensation scheme in place during Task Order II.  Thus, any references to docking are only

relevant to the compensation scheme in place during Task Order I.  Furthermore, the e-mail states

that the GAB supervisor informed the Claims Reviewer that employees no longer needed to

inform their supervisor of their arrival time in the morning.  This supports GAB's position that

after April 1, 2001, GAB no longer kept track of hours worked because Claims Reviewers were

being paid on a straight salary basis.

Based on this evidence, the Court finds that the salary basis test is satisfied for the time

period covered by Task Order II.  The Court, therefore, must determine if Claims Reviewers

satisfy the duties test for exempt administrative employees.

B.      Duties Test

The DOL has established both a "short" and a "long" duties test to determine whether

someone is an exempt administrative employee. 29 C.F.R. § 541.2.  The short test applies when

the employee is compensated on a salary basis of not less than $250 per week, exclusive of board,

lodging, or other facilities. 29 C.F.R. § 541.2(e)(2).  The long test applies where an employee is

paid less than $250 per week, but more than $155 per week, exclusive of board, lodging, or other

facilities. 29 C.F.R. § 541.2(e)(1).  During Task Order II, Claims Reviewers were paid more than

$250.00 per week, thus the short test must be applied.

The short test is satisfied, in relevant part, if an employee has a primary duty consisting of

the performance of office or non-manual work directly related to management policies or general

business operations of his employer or his employer's customers and he uses discretion and

independent judgment in his work.  29 C.F.R. § 541.2(e)(2).

17

The first element of the short test requires that the employee's primary duty be office or non-manual work directly related to the management policies or general business operations of GAB or its customers.  It is undisputed that Claims Reviewers performed office or non-manual work.  The only question, therefore, is whether this work is directly related to the management policies or general business operations of GAB or its customer, FEMA.  DOL regulations provide that:

> (a)    The phrase "directly related to management policies or general business operations of his employer or his employer's customers" describes those types of activities relating to the administrative operations of a business as distinguished from "production" or "sales" work.  In addition to describing the types of activities, the phrase limits the exemption to persons who perform work of substantial importance to the management or operation of the business of his employer or his employer's customers.

29 C.F.R. § 541.205(a).  Employees performing work of substantial importance "include those . . . who either carry out major assignments in conducting the operations of the business, or whose work affects business operations to a substantial degree . . .."  29 C.F.R. § 541.205(c).

DOL regulations provide that the test of  "directly related to management policies or general business operations" is met by "credit managers, safety directors, *claim agents and adjusters*, wage-rate analysts, tax experts, account executives of advertising agencies, customers' brokers in stock exchange firms, promotion men, and many others."  29 C.F.R. § 541.205(c)(5) (emphasis added).[6]  A recent opinion letter by the Department of Labor's Wage and Hour

---

[6] New regulations were recently promulgated by the Secretary of Labor to "restore the overtime protections intended by the FLSA" and to streamline and simplify the regulations to ensure correct interpretations and proper application of the exemptions in today's workplace. While the updated regulations do not apply to this case, it is instructive to note that the regulations specifically provide that "[i]nsurance claims adjusters generally meet the duties requirements for the administrative exemption, whether they work for an insurance company or other type of company, if their duties include activities such as interviewing insureds, witnesses

18

Administrator reaffirms that exempt administrative status is appropriate for claims adjusters who are "responsible for planning the processing of a claim from the beginning to the end," who handle "the process of gathering the evidence, assessing credibility, reviewing the insurance policy, determining whether or not there is coverage, evaluating liability, making a decision on whether and how much to pay on the claim, establishing a reserve for the case [and] making a recommendation on claims above their established authority."[7]  Dept. of Labor WH Admin. Op. (November 19, 2002), Daily Lab. Rep. (BNA), Nov. 20, 2002 ("2002 DOL Opinion Letter"). The opinion letter further states that these duties are of substantial importance to the business because the clams adjusters in question handled "essential aspects of every claim processed" and because their determination about "what the damages are, can result in extremely large financial consequences" for their employer.

Courts similarly have found that insurance claims adjusters perform activities directly related to management policies or general business operations of their employer or their employer's customers in satisfaction of 29 C.F.R. § 541.205.  *See Bratt v. County of L.A.,* 912 F.2d 1066, 1069-70 (9th Cir. 1990) (insurance claims agents and adjusters meet the directly related test);  *Haywood v. N. Am. Van Lines, Inc.,* 121 F.3d 1066, 1072 (7th Cir. 1997) ("claims agents and adjusters . . . are specifically mentioned by the regulations as meeting the 'directly related' test");  *McAllister v. Transamerica Occidental Life Ins. Co.,* 325 F.3d 997 (claims

---

and physicians; inspecting property damage; reviewing factual information to prepare damage estimates; evaluating and making recommendations regarding coverage of claims; determining liability and total value of a claim; negotiating settlements; and making recommendations regarding litigation."  29 C.F.R. § 541.203(a).

[7]  DOL Opinion letters should be considered and given due deference but they are persuasive authority only and are not binding.  *See Hogan*, 361 F.3d at 628, n.8.

examiner is an exempt administrative employee); *Jastermski v. Safeco Ins. Co.*, 243 F. Supp.2d 743, 758 (N.D. Ohio 2003) (insurance adjuster is an exempt administrative employee); *Palacio v. Progressive Ins. Co.*, 244 F. Supp.2d 1040, 1049 (C.D. Cal. 2002) (claims representative is exempt administrative employee).

The Claims Reviewers' duties are virtually indistinguishable from the job duties of insurance claims adjusters.  The traditional duties of claims adjusters include assessing liability, weighing evidence, determining credibility, reviewing insurance policies and making recommendations to management based on skills, knowledge and training.  *See, e.g., Palacio,* 244 F.Supp.2d at 1045-46.  Similarly, Claims Reviewers explained to claimants how the claims process  worked; determined what information would be necessary to support a claim; assisted claimants in locating documentation to support their claim; placed values on losses; reviewed the CGFAA and the policy guidelines to determine whether particular losses were covered; established reserves; confirmed the cause and origin of the loss; made credibility determinations; negotiated with claimants regarding the value of the loss; and made recommendations regarding the amount that should be paid by FEMA.  Like claims adjusters, Claims Reviewers' recommendations regarding the value of claims had substantial financial consequences for their employer or their employer's client.[8]

---

[8]  The Court rejects Plaintiffs' attempt to classify themselves as production workers. The FLSA distinguishes between employees who perform duties connected with "running the business itself" and those engaged in "production" or "sales."  First, the distinction between administrative and production employees is not dispositive of exempt status.  It is merely on tool that may be used to the extent that it helps answer the ultimate question of whether work is "directly related to the management policies or general business operations."   *See Bothell v. Phase Metrics, Inc.,* 299 F.3d 1120, 1127 (9th Cir. 2002) (administration/production dichotomy is an analytical tool to be used only to the extent that it clarifies the analysis and not as an end in itself).  Second, claims adjusters' duties routinely have been found to be related to the "servicing" of a business.  *See*

While minor distinctions between the duties and responsibilities of a typical claims adjuster and the duties and responsibilities of the Claims Reviewers can be made, these distinctions are insufficient to alter the conclusion, reached both by other courts and the DOL, that this type of position performs work "directly related to management policies or general business operations" in satisfaction of 29 C.F.R. § 541.205.   Thus, the Court finds that the first element of the "duties test" is satisfied.

The second element of the short test is that the employee "uses discretion and independent judgment in his work."  29 C.F.R. § 541.2(e)(2).  "In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered."  29 C.F.R. § 541.207(a).  The regulations note that "discretion and independent judgment" are to be distinguished from the use of skill in various respects:

> An employee who merely applies his knowledge in following prescribed procedures or determining which procedure to follow, or who determines whether specified standards are met or whether an object falls into one or another of a

---

*Bratt*, 912 F.2d at 1069-70 (claims agents and adjusters are examples of employees "servicing" a business); *Palacio*, 244 F.Supp.2d at 1047 (claims adjuster who negotiates with clients, settles damage claims on behalf of her employer, and advises supervisors on claims handling and related matters is servicing a business); *Bothell*, 299 F.3d at 1126 (employee who negotiates with clients and settles damage claims on behalf of an employer engages in duties consistent with the servicing of a business even though those activities can be viewed as ancillary to the provision of a good or service); 2002 DOL Opinion Letter (insurance claims adjusters perform work that is administrative in nature, as distinguished from production or sales).  Like claims adjusters, the undisputed evidence establishes that the Claims Reviewers negotiated with claimants and recommended settlement values to their supervisors.  The Court also notes that the Secretary has recently promulgated new regulations that clarify that "production" work is "working on a manufacturing production line."  *See* 29 C.F.R. § 541.201 (to qualify for the administrative exemption "an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product.").

> number of definite grades, classes, or other categories, with or without the use of
> testing or measuring devices, is not exercising discretion and independent
> judgment . . . this is true even if there is some leeway in reaching a conclusion, as
> when an acceptable standard includes a range or a tolerance above or below a
> specific standard.

29 C.F.R. § 541.207(c)(1).

Claims Reviewers performed numerous tasks that required the exercise of discretion and

independent judgment.  Claims Reviewers planned how to investigate claims, determined if

coverage for a loss existed under the CGFAA, defined the appropriate documentation needed to

substantiate a claim, helped claimants formulate a strategy for obtaining any necessary

documentation, placed values on losses based on their discretion, research and experience,

negotiated with claimants as to the value of their claims, and recommended fair and reasonable

settlement values to FEMA.  These are the type of duties that repeatedly have been held to

require the exercise of discretion and independent judgment.  *See, e.g.*, 2002 DOL Opinion Letter

(claims adjusters exercised independent judgment and discretion not only by making

recommendations about the amount of loss, but also by determining how much a claim is worth);

*McAllister*, 325 F.3d at 1002-03 (insurance adjuster who investigated claims, determined whether

to pursue fraudulent claims, settled claims within her authority, interpreted contract law and

insurance statutes, and was required to use "common sense judgment," exercised discretion and

independent judgment); *Jastremski*, 243 F. Supp. 2d at 758 (claims adjuster who verified

coverage of claims under the insured's policy; planned how to investigate a claim, including

gathering facts, interviewing witnesses, using field representatives, and compiling scene diagrams;

negotiated settlements; settled claim within his commitment authority; and made

recommendations to his supervisors on claims above his settlement authority exercised discretion

and independent judgment); *Palacio*, 244 F.Supp.2d at 1048-49 (claims adjuster exercised discretion and independent judgment in negotiating and handling claims).

Plaintiffs argue that Claims Reviewers did not exercise discretion and independent judgment in executing their primary job duty because they were guided by detailed claims adjusting regulations and could only make recommended settlements, not actually settle claims. The fact that Claims Reviewers operated within the framework of regulations and standardized claims forms is insufficient to distinguish Claims Reviewers from typical insurance claims adjusters who evaluate losses and negotiate settlements within the context of their employer's detailed claims manuals, state law, and the terms of an insurance policy.  *McAllister,* 325 F.3d at 1001 (fact that claims adjuster was required to follow detailed claims manuals does not mean she did not exercise discretion and independent judgment); *Dymond v. U. S. Postal Serv.*, 670 F.2d 93, 95-96 (8th Cir.1982) (postal inspectors were exempt administrative employees, even though they were required to follow procedures, standards and policies of a detailed field manual, because they wtill exercised discretion and independent judgment).

The fact that Claims Reviewers could not actually settle claims does not mean that the Claims Reviewers did not exercise discretion and independent judgment.  *See* 29 C.F.R. § 541.207(e)(1) ("The decision made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action."); *Dymond,* 670 F.2d at 96 (oversight does not mean that a worker is not required to use discretion and independent judgment; 2002 DOL Opinion Letter (claims adjusters with very limited authority exercise independent judgment and discretion because "even those adjusters make recommendations to their supervisors on the appropriate value of much larger claims, which were

23

frequently accepted").

The striking similarities in functions performed by insurance claims adjusters and the Claims Reviewers compel the conclusion that the Claims Reviewers had a primary duty consisting of the performance of office or non-manual work directly related to management policies or general business operations of his employer or his employer's customers and that the Claims Reviewers used discretion and independent judgment in their work.

During Task Order II, Claims Reviewers were salaried employees who performed office or nonmanual work that was directly related to GAB, or GAB's customer's, management or business operations.  This work required Claims Reviewers to exercise independent judgment and discretion.  Consequently, GAB properly asserted an exemption to the overtime requirements of the FLSA for Claims Reviewers during this period.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant's Cross-Motion for Summary Judgment, filed May 30, 2003, **[Doc. No. 56]**, is hereby **GRANTED in part.**  Summary judgment is hereby granted to Defendant on the question of whether Defendant properly claimed an exemption to the overtime requirements of the Fair Labor Standards Act for Claims Reviewers during Task Order II.  In all other respects, Defendant's motion is denied.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment, filed September 17, 2004, **[Doc. No. 90]**, is hereby **GRANTED in part**.  Summary judgment is hereby granted to Plaintiffs on the question of whether Defendant properly claimed an exemption to the overtime requirements of the Fair Labor Standards Act for Claims Reviewers during Task Order I.  In all other respects, Plaintiffs' motion is denied.

24

**IT IS FINALLY ORDERED** that the parties submit briefs on the issue of damages. Plaintiffs' opening brief shall be filed with the Court no later than June 20, 2005, and Defendant's response brief shall be filed with the Court no later than July 18, 2005.

Dated this 16th day of May, 2005.

_____
MARTHA VÁZQUEZ
U. S. DISTRICT COURT JUDGE

Attorneys for Plaintiffs:
    Joseph E. Fieschko, Jr., Esq.
    Turner W. Branch, Esq.
    James A. Noel, Esq.

Attorneys for Defendant:
    Allison Blakley, Esq.
    Jeff Goldman, Esq.
    Thomas L. Stahl, Esq.